Mr. Glass. Yes, Your Honor. You may proceed. May it please the Court. My name is Ethan Glass. I have been appointed by this Court to represent the Salehi family. One thing I'd like to note at the outset is this is not a case arising from any criminal proceedings. This is a case where the Salehi family voluntarily appeared at the Department of Homeland Security pursuant to a notice that they received to be fingerprinted. Could you just raise your voice just a little, please? Yes, Your Honor. Acoustics are not too great in this courtroom. I just don't see why we should forget about the Lozada procedure. It seems like a useful procedure because you get the lawyer's side of the story. In a lot of cases, asylum cases, all we really get is the asylum seeker's side of the story, and then sometimes we have the I.J. poking holes in it. But in an ineffective assistance case, it really is possible to get both sides of the story, and you're asking us to adjudicate it without having that benefit by skipping the Lozada compliance. Well, Your Honor, we're not asking that you skip the Lozada compliance. We're saying that it's been satisfied by the plain face of the administrative record. Nobody ever wrote the lawyer a letter and said, what's your excuse? What happened? Well, Your Honor, in this case, it doesn't matter. I mean, for all we know, what the Salehis are telling us is not true, and the lawyer can prove it, but nobody's asked them. Well, Your Honor, what we can tell from the record is that there was a hearing that the attorney, Mr. Brownstein, was ordered to appear at, that he did not appear at that hearing, and that that non-appearance was the direct result in an abstention order. Let's assume, counsel, that, and I take it your argument is that the record carefully examined shows practical compliance with Lozada. Yes, Your Honor. That's basically your argument. Well, let's assume, for the purpose of the question I'm about to ask you, that that's correct. The agency has a regulation at 8 CFR which says if you move to reopen, you have to attach to the motion to reopen an application for relief and supporting documents, right? Yes, Your Honor. To me, this sounds, A, a reasonable regulation that's capable of screening out an application where there might be merit to open the door, but not in terms of the application itself. It sounds a little bit like our civil rules that when you move for a new trial, you have to show that you've got a cause for relief. It's not just enough to say I've got an excuse for what happened, the late filing or whatever. Why don't we start with, don't we have to ignore this regulation in this case to provide relief to your client? No, Your Honor. You do not need to ignore it. An important component. We start with whether there was attached to the application to the motion to reopen an application for relief with supporting documents. There was not, Your Honor. But. So there was not compliance with the regulation I just spoke to. Well, Your Honor. Correct? There was not compliance with the language of the regulation. But if I can point you to the. In what circumstances, and I'll stop and let you finish, why should we either ignore the regulation? What is it about the facts of this case that show there was compliance with it? Tell me why we should not enforce this regulation. Your Honor, it's two-part. One, the government did not oppose the motion to reopen. And under the Yuansen case, the Board of Immigration Appeals' own precedent, when the government does not oppose a motion to reopen, it is deemed to have joined that motion and, therefore, alleviates the petitioners of having to submit and follow that rule. So that's the first component. The second component is this Court has held on numerous occasions, including the Castillo-Perez case and the Yang-Lo case, that prejudice is unnecessary or at least is deemed shown when it's an inabstential order that was caused by the attorney's ineffective assistance. To require the family to submit an application and to prove that they have a meritorious asylum claim at this State would essentially require them to show prejudice, which this Court has deemed shown merely by the fact that they were deprived of their full and fair hearing, to which they're entitled under the Due Process Clause. Okay. Your Honor, Judge Kleinfeld, to address the Lizada points, this Court has held on numerous occasions that these requirements are not sancrosanct, and I quote that from the Castillo-Perez case, where on the face of the record, the petitioner has complied in essence with the purposes of the Lizada requirements. But I can't see that there's compliance in essence. It seems like I don't have, when I look through the excerpts, maybe I missed it and you can point me to it, a letter to the lawyer saying here's what's alleged, what's your excuse or disagreement. Your Honor, there is not that. But there is practical compliance. This was an attorney who was disbarred by the time that these reopening proceedings were undertaken. This is a record that shows that he found fair. I have over the course of my career actually known some disbarred lawyers, and some of them were crooks and some of them were drunks and various reasons. But nevertheless, there were cases where in some particular case they handled it just fine. So I can't infer from the disbarment that the lawyer is guilty of ineffective assistance in any particular case. Well, Your Honor, you can. And this Court has, under the Castillo-Perez case in footnotes 6 and 11, where the disbarment record, as you can see from that record, he has conducted himself in a very similar manner to what is shown by the record in this case. So you can take from that that there was no need to actually send a letter to Mr. Brownstein because he either wouldn't have responded, as he didn't in this case, or he would have responded by saying, yeah, it didn't appear. And like convicting a guy at burglary because even if we never asked him whether he committed this one, we know he committed two others in the past? Well, not exactly, Your Honor. It's like giving a petition of relief based upon inferences that maybe in and of itself might not prove that the attorney committed some sort of crime. But based upon our record here ---- What's the burden of just asking him? Well, Your Honor, it's not great. Although this was an attorney who the record shows that he was not appearing and there was no accurate address to get a hold of him at. So if there was good cause shown, an attempt had been made to comply with Lozada but the guy could not be found, that would probably be a good excuse for not complying with Lozada. Well, as the record shows, what the attorney at the Immigration Court and the Board of Immigration Appeals submitted to the courts was that this gentleman was disbarred and that his address of record was not his current address. Anyone look in the phone book? No, Your Honor. Not that I know of. Not in the record. Those net services? Not that I know of, Your Honor. Another important point on the Lozada case is that this Court has held that Lozada is there to protect against collusion. And here I think it's also apparent from the record that there wasn't a collusion between the petitioners and this attorney. This attorney abandoned them. It's plain and simple from the transcript that they relied upon him to appear to a hearing that they were excused from and to submit their applications. He didn't do so. There would be no reason why they would ask him not to do that. Well, you know, these requirements here are a little bit like you file a civil complaint in court and you have to say where the defendant and the plaintiff live and whether they're residents of the State or the county or the district or whatever, and I suppose you could say I don't have to comply with that because it's obvious that he lives in California, it's obvious that he lives in the northern district or whatever. But there are purposes for these things. One is to show that there really was an attorney-client relationship between, in this case, the family and Mr. Brownstein. But it's you have to touch the bases or have a very good excuse for not touching the bases. We understand your argument. The record shows that there was a relationship, that he did undertake the duty. In fact, he promised an immigration judge, told the immigration judge, I think, that he had the documents all prepared, all he had to do was have his clients sign them and then he would file them that afternoon and apparently failed to do so. Yes, Your Honor. Okay. This would be a case such as Your Honor mentioned in the last case where some small technical requirement, which is more or less satisfied by the record, would prevent these people from getting a full and fair hearing on the merits of their case. It would be unjust. Another, Your Honor, may I reserve two minutes for rebuttal? Sure. Thank you, Your Honor. May it please the Court. My name is Carl McIntyre and I represent the Attorney General in this manner. Your Honors, I wanted to emphasize that the Aliens Council is trying to suggest that there was per se an ineffective assistance of counsel here without affording the immigration agency the opportunity of the actual make-up for that claim. And what I'm saying is Here's what I understand. Brownstein appeared on behalf of the family on more than one occasion. Yes, Your Honor. And stated affirmatively that he was their attorney of record and filled out the forms that said he was. Yes. So there's no dispute that he was their lawyer. No dispute that he was their lawyer. And there's no indication anywhere in the record that he ever withdrew, that they consented to his withdrawal itself. No. Okay? And one of the interesting things about the record in this case was that, to me, this was an extraordinarily patient and understanding immigration judge. Delayed things a couple of times. Yes. There was a time when Brownstein was supposed to show up and he wasn't there. He even sent his clerk out to look for him. Yes. Correct? Yes. And got Brownstein to say, on the record, I got the asylum application. It's all filled out. I just have to have the family sign it and I'm going to file it this afternoon. Right? I am not sure about the facts about that there was a completed application. I know that he did tell I think you're correct about that. I know that he did tell the court that he would, that he was going to try to be there to correct him. I think what he said was, I've taken all the information from the applicants. The only thing that remains is for me to type it and I guess have them sign it. You're absolutely correct on that point. But the point is that no, according to what he told the immigration judge, nothing further need be done other than to type it up and have it signed and filed it. And he indeed promised to file it. Right? Yes, Your Honor. But I don't think you can presume by that that there was no question about whether to proceed at that point. Because we've had The I.J. stated for the record, this is at 91 of the administrative record, that his court clerk had spoken with Brownstein, who again promised to file the application for relief. And no such application was filed. Right? Correct, Your Honor. So he was the counsel. He was counsel. He promised the immigration judge he would file the asylum application, told him that all he had to do was type it up, never filed it. And then it turns out he was disbarred. Yes. Maybe related to other claims. Yes. But we still believe that the Lozada requirements, that there needs to be airing of his side of the story. And coming to the court 12 years after the fact deprives the agency of a contemporaneous look at what happened, and to give the attorney the respect that he is due to explain his side of the story and to fully enlighten the court. That's a perfectly fair point. But don't the bar records indicate that Brownstein failed to respond to the bar complaint? I believe there was one. On at least one charge that formed the basis for his disbarment, he failed to respond to it. I do believe that. Can I answer also, Your Honor, that if you're talking about the — are you talking about things in the judicial notice packet? Yes. I would suggest that the court should not take judicial notice without having the attorney have responded, that it would be perfectly fine to have a judicial notice of his conduct outside of the record, possibly if there had been a determination, there had been an attempt, contemporaneous attempt, to give the attorney a chance to speak. And since you don't do that, I don't think you get the opportunity to go outside the record with a packet with regard to his — I'm sorry to interrupt you. At some point the family did bring like a printout off the Internet that showed that Brownstein had been disbarred? Yes. That was the only thing in the actual record. It was kind of confusing. I was trying to figure out what it was myself when I was looking at the record, Your Honor. And I believe that it wasn't clear enough to the agency as to just what that document was and what official imprimatur it had. Didn't he resign? Walk away from the whole thing. The — Disbarment. It suggested that he resigned in 92, Your Honor. But in those days — But 1990 was the time when he didn't show up. It was two years after that. Let me ask you this. In those days, a disbarred attorney was not precluded from appearing before immigration. That is true, Your Honor. Because the agency's policy was that disbarred lawyers better than no lawyer at all. Yes, that is true, Your Honor. The appearing before government agencies has been an evolving question with regard to the bar rules. And I am not sure what they were then, but it's consistent with my understanding that it has not always been a requirement. Your opposing counsel argues that compliance with H.C.F.R. 1003 should be excused because in this case, the government did not respond to the motion to reopen, and under the law of the Board of Immigration Appeals, that's — They joined. Let me finish. That's an acceptance of the viability of the motion to reopen, et cetera. What's your response? I have no — I have no knowledge of that law, Your Honor, with regard to — he said — he suggested that they joined in the motion. It's not my understanding that a — I think what he argued, and there are similar rules in civil practice among the local districts, at least in the Ninth Circuit, that if an opposing party files a motion and the other side fails to respond, that failure to respond constitutes a joinder in the motion. I think that's what was argued. Now, do you have a different view of the law on that? Yes.  It might suggest — it is my understanding that it is no different than not asserting one way or the other your opinion on the motion, not that you join in it. That is my understanding. The text — there are some rules that are worded as Judge Hawkins just described. If you don't oppose the motion, you're treated as conceding that it's meritorious, or you're treated as joining in it. I know. There are other rules where you're not even allowed to oppose it. For example, you can't oppose a petition for rehearing in our court unless we direct you to. Your non-opposition doesn't indicate any concessions at all. And there are others still where you don't have to file an opposing brief, but if you don't file an opposing brief, we'll still look at the appellant's brief and maybe turn it down if we think it's wrong. And I don't know which this is. Do you remember any text? No. I do not remember the actual text of the law that he is — but I do not know of any law. This is an issue where the panel could be helped by post-argument briefing. We'll ask you if we need it. Let me ask you about something else that's on my mind, that 12-year delay. That's really dramatic. All this business with the lawyer happens, and then the Salahis just stay here with no right to be here for 12 years. Yes. But if they had no idea there was anything wrong with their being here, if as far as they knew their lawyer had taken care of everything and they have a right to be here, well, then the 12 years really isn't their problem at all. So which is it? I don't think that you could assume that from going into an exclusion order, that the attorney in not appearing at all during that time, that you can assume that that exclusion order went away, that there's no further problems with that. What I'm trying to find out is what knowledge the Salahis would have had about whether they're allowed to stay here or whether they're required to go unless they do something. My point is that they got quite a bit of notice. They did have an attorney talk with them for some time. They knew that they were going to be excluded if they didn't show up for certain things. During this 12-year period of time, correct me if I'm wrong about the following. No notice of any kind emanated from the government to the family. With regard to the exclusion order? Yes. That's correct. That is correct. But the reverse is not true. Didn't the family notify the agency on one or more occasions of a change in their address? I believe they did. I'm not sure. What should we infer from that? Isn't the most reasonable inference that they thought everything was okay? I don't believe that you can. If you think that you're hiding and that the minute the government finds you, they're going to rip you out of the country, why on earth would you tell that government where you are when you change your address? But I think we also have that four years later, someone looked into what was going on with regard to the asylum application and didn't come forward with anything else. And for us to think that they didn't need to do anything, that wouldn't have made sense for them to go to that other attorney and to try to file an asylum application again. I think that the record to me shows that something should have been done at a very, very early point, and that's what the agency made a point about, that if something had been done at a very early point, maybe these questions we wouldn't have had if they had at least tried to pick up a phone and say something. I agree that there was no February 26 hearing, but at least some, they knew that since they claimed that they didn't know that there wasn't one, there should have at least been a call, at least a call. Well, you know, people would come here from other countries and they're asylum applicants and they have a lot of fears, and in this case here, it seems like they understood. They understood that their lawyer had filed the necessary application and, you know, they didn't hear, so no news is good news, and when they moved and they had a change of address, they sent out information of that change to the government. I mean, doesn't the government have an obligation to keep on top of its files? Did the file get lost someplace? No, I don't think the file would have gotten lost, but the thought was that the ---- We do have a lot of files that get lost, don't we? Yeah, I understand that, but I think the ---- I've heard of them. No, but I just don't think that at that point they knew anything. Since this was 12 years down the road, at that point, they didn't know that the counsel was allegedly a bad counsel and had not told them about ---- So it wasn't ---- In other words, I think you're saying that they should have generated maybe another document because of the new address. At that point, they didn't know that counsel didn't receive ---- I mean, that the alien didn't receive a document from counsel, so it's no reason for them to have done anything additional at that point. Can I make one more point? I see I'm out of time. That's all right. And that is that I wanted to make the point with regard to the Supreme Court precedent with regard to ineffective assistance of counsel, and the government wants to suggest that the court take another look at the issue with regard to right to assistance in our briefs. And thank you very much, Your Honor. Well, we probably have to go in the bank or something like that. Okay. Thank you, Your Honor. There was a lot of points raised by the government's arguments, so I'll try to go through them quickly. The first that I would like to address is the Yowandison case. We briefed it on pages 27 and 28 of our brief. In that case, the Board of Immigration Appeals says, and I quote, that the BIA's failure to file an opposition was deemed affirmatively joining the motion. So I think that it's pretty clear from BIA precedent at least that this is not a case where failure to appear or file an opposition is of course. This is an affirmative joining. That same case, interpreting the predecessor to the statute cited by the government, says that because they affirmatively joined the motion, the requirements of the regulation have been satisfied. I would also like to address this argument about diligence. I think it's important to note, Your Honors, that Excerpt of Record 34 is a declaration by Mr. Sedlecki. It says that not only did they send change of address forms to the Immigration Naturalization Service, it affirmatively states they did not know about the order of exclusion until 2001 when they were brought up before the immigration court. Nothing else in the record contradicts this. And the government cited the appearance of Ms. Stancil in the record. It shows nothing. There's nothing to show that Ms. Stancil was even hired by the Salehis. And I would like to note, Your Honors. I guess what we have is the Salehis saying we didn't even know about the hearing. Yes, Your Honor. We don't have anyone asking the lawyer. And for all we know, the lawyer would say, I told them about the hearing, and then when they didn't show up, I was making excuses, I was dodging around, I was delaying myself in the hopes they would show up. I mean, is that possible on this record? No, Your Honor. It was actually slightly different. Respectfully, the ---- It happens sometimes. I remember sometimes a client doesn't show up and the lawyer just dodges all around in order to avoid having bail revoked or whatever. This is slightly different, Your Honor. This was a case in which the immigration court expressly excused the Salehi family from appearing at the hearing. The only person that was ordered to appear was Mr. Brownstein. Mr. Brownstein failed to appear, and in fact, several times during the course of the day, as the transcripts show, had told the court that he would appear, and he still failed to appear. This is not a case where the Salehi family was knocking around the courthouse or Mr. Brownstein would be able to respond with anything. This is shown by the record that Mr. Brownstein, being the only person who had to show, did not show. I don't know what his response would help this Court with at all. This is a situation in which Mr. Brownstein's ineffective assistance, his failure to appear at the hearing, his failure to file the application directly resulted in the inabstentia order. Another thing I'd like to note about Mr. Brownstein is that the Supreme Court did not issue a judicial notice. This Court can impute that this was a gentleman who did not satisfy his obligations as an attorney, and as this Court held in the Castillo-Perez case, that's important to the determination whether the Lizada requirements are satisfied. I would also like to respond to the government's argument that there has not been ineffective assistance shown. I can't imagine a case in which there could be more ineffective assistance. Mr. Brownstein was ordered to appear. The consequences of failing to appear were known. He did not appear. It resulted in inabstentia order of exclusion. There's no middle ground here. This isn't a discretionary call that he made whether to object to a certain piece of evidence.  And that failure immediately resulted in prejudice to the clients. I'd also like to respond to the government's argument that we haven't afforded Mr. Brownstein an opportunity to respond. First, Mr. Brownstein didn't show. Second, the government didn't oppose this in front of the Immigration Court and the Board of Immigration Appeals. If the government thought that this was something that was important to develop the record any further than it was on the ineffective assistance of counsel issue, it had an opportunity to do so. And it failed to do so. It cannot now use that failure to oppose the motions in any way to prevent the CILAHIs from prevailing here and before this Court. I would finally like to point the Court towards our final claim of error, and that's the statutory argument. I won't spend too much time unless the Court wants to. Something you raised in your opening argument? It is not, Your Honor. Then I don't see how you can raise it in rebuttal. Okay. Thank you, Your Honor. It's briefed.  That's it? Unless you have any questions, Your Honor. I have no questions. Fine. Fine. Thank you. The matter will stand submitted, and the Court will recess until 1.30 this afternoon. All rise. This court stands to recess until executive. Thank you for a good job. Thank you. Thank you.
judges: Pregerson, Kleinfeld, Hawkins